CHAD A. READLER
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
JEFFREY S. ROBINS
Assistant Director
AARON S. GOLDSMITH
Senior Litigation Counsel
VA State Bar No. 45405
Email: Aaron.Goldsmith@usdoj.gov
Telephone: (202) 532-4107
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Washington, DC 20044
NICOLE GRANT
Trial Attorney

ALANA W. ROBINSON
Acting United States Attorney
REBECCA G. CHURCH
Assistant U.S. Attorney
Cal. State Bar No. 259652
Email: rebecca.church@usdoj.gov
Telephone: (619) 546-7721
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Facsimile: (619) 546-7751

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Juan Manuel MONTES BOJORQUEZ, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION, *et al.*, <br><br> Defendants. | Case Nos. 17cv780 GPC (NLS) <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

THE ALLEGATIONS OF MR. MONTES ........................................................ 2

BACKGROUND ON EXPEDITED REMOVAL AND DACA ......................... 4

STANDARD FOR A PRELIMINARY INJUNCTION ..................................... 8

ARGUMENTS ............................................................................................ 10

I.   It is inappropriate to grant Mr. Montes the ultimate relief that he seeks at the preliminary injunction stage. ............................................................. 10

II.  Mr. Montes cannot demonstrate that this Court has jurisdiction over his claims. ............................................................................................ 13

    1.  Mr. Montes cannot establish jurisdiction in light of the inconsistencies within his Motion for Preliminary Injunction ................................................... 14

    2.  Mr. Montes account of the alleged February18-19 event is contradicted by the Government's sworn declaration. ........................... 17

    3.  The additional declarations from other witnesses that Mr. Montes provided are neither admissible nor probative. ................................................. 18

III. Mr. Montes failed to meet his burden under *Winters* ......................... 19

    1.  Mr. Montes failed to show a substantial likelihood of success on the merits. .................................................. 19

    2.  Plaintiff failed to establish a future immediate irreparable harm. ........................................................ 21

    3.  Plaintiff failed to establish that the balance of hardships tips decidedly in his favor. ......................................... 22

CONCLUSION ........................................................................................ 24

i

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ................................................................... 9, 10

*Anderson v. United States,*
    612 F.2d 1112 (1979) .................................................................................. 10

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ............................................................. 7, 8, 20

*Arizona v. United States,*
    132 S. Ct. 2492 (2012) .................................................................................. 6

*Bemis v. Edwards,*
    45 F.3d 1369 (9th Cir. 1995) ...................................................................... 18

*Boyd v. City of Oakland,*
    458 F. Supp. 2d 1015 (N.D. Cal. 2006) ..................................................... 18

*Caribbean Marine Services Co., Inc. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ........................................................................ 9

*Castro v. U.S. Dep't of Homeland Sec.,*
    163 F. Supp. 3d 157 (E.D. Pa. 2016) ........................................................... 5

*Dahl v. HEM Pharmaceuticals Corp.,*
    7 F.3d 1399 (9th Cir. 1993) .............................................................. 10, 15, 16

*Dennis v. I.N.S.,*
    No. 301-CV-279-SRU, 2002 WL 295100 (D. Conn. Feb. 19, 2002) .......... 12

*Diaz-Sanchez v. Gonzales,*
    No. 04-70253, 128 F. App'x 1 (9th Cir. Feb. 11, 2005) ...................... 14, 16

*Fabian-Lopez v. Holder,*
    No. 11-71513, 540 F. App'x 760 (9th Cir. April 29, 2013) .......................... 8

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ............................................................................. 11, 23

*Galindo-Romero v. Holder,*
    621 F.3d 924 (9th Cir. 2010) ........................................................................ 5

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) .................................................................................... 11

*Intern. Union of Bricklayers and Allied Craftsmen v. Meese,*
    761 F.2d 798 (D.C. Cir. 1985) ................................................................... 24

*J.E.F.M. v. Lynch,*
    837 F.3d  (9th Cir. 2016) ............................................................................ 12

*Kaddoura v. Gonzales,*
  No. C06-1402 RSL, 2007 WL 1521218 (W.D. Wash. May 21, 2007).........................20

*Li v. Eddy,*
  259 F.3d 1132 (9th Cir. 2001) ...........................................................................6

*Luciano v. Holder,*
  No. 15-cv-0090-GPC, 2015 WL 4249520 (S.D. Cal. July 13, 2015) ...............8, 12, 23

*Lydo Enterprises, Inc. v. City of Las Vegas,*
  745 F.2d 1211 (9th Cir. 1984) ...................................................................21, 23

*Mada-Luna v. Fitzpatrick,*
  813 F.2d 1006 (9th Cir. 1987) ...................................................................8, 23

*Maryland v. King,*
  567 U.S. 1301 (2012) ................................................................................23

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ....................................................................24

*Nken v. Holder,*
  556 U.S. 418 (2009) ...........................................................................22, 23

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
  762 F.2d 1374 (9th Cir. 1985) ....................................................................21

*Orabi v. Attorney General of United States,*
  738 F.3d 535 (3d Cir. 2014) ......................................................................12

*Ovalle v. U.S. Dep't of Homeland Sec.,*
  No. 09-CV-3820 (SLT)(LB), 2010 WL 5158105 (E.D.N.Y. Nov. 24, 2010) .............20

*Perales v. Casillas,*
  903 F.2d 1043 (5th Cir. 1990) ....................................................................20

*Rantesalu v. Cangemi,*
  No. 04-CV-1375 (JRT/SRN), 2004 WL 898584 (D. Minn. Apr. 23, 2004).................12

*Red Top Mercury Mines, Inc. v. United States,*
  887 F.2d 198 (9th Cir. 1989) ...............................................................14, 18

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ............................................................................7, 10

*Riad v. I.N.S.,*
  161 F.3d 14 (9th Cir. 1998) .......................................................................16

*Rincon v. DHS,*
  539 F.3d 1133 (9th Cir. 2008) ................................................................5, 16

*Roberts v. Veterans Village Enterprises, Inc.,*
  Case No. 17-cv-524-LAB, 2017 WL 1063477 (S.D. Cal. Mar. 20, 2017) ..................21

*Rodriguez v. Sessions,*
  No. 15-72487, 2017 WL 695192 (9th Cir. Feb. 22, 2017)......................................8, 23

iii

*Senate of State of Cal. v. Mosbacher,*
  968 F.2d 974 (9th Cir. 1992) ...................................................................9, 11, 13, 19

*Taiebat v. Scialabba,*
  Case No. 17-cv-0805-PJH, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ....................9

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .....................................................................................7

*U.S. Postal Service v. Gregory,*
  534 U.S. 1 (2001) .....................................................................................................14

*United States v. Alarcon-Simi,*
  300 F.3d 1172 (9th Cir. 2002) ...................................................................................18

*United States v. Flores-Montano,*
  541 U.S. 149 (2004) ..................................................................................................11

*University of Texas v. Camenisch,*
  451 U.S. 390 (1981) ...............................................................................................8, 10

*Vilchiz-Soto v. Holder,*
  688 F.3d 642 (9th Cir. 2012) .......................................................................................8

*Wahoo Intern., Inc. v. Phix Doctor, Inc.,*
  No. 13-cv-1395-GPC(BLM), 2014 WL 2106482 (S.D. Cal. May 20, 2014) .........21, 22

*White v. Smyers,*
  No. 212-cv-2868-MCE(ACP), 2016 WL 4445338 (E.D. Cal. Aug. 23, 2016) .............9

*Winter v. Natural Resources Def. Council,*
  555 U.S. 7 (2008) .........................................................................................9, 11, 18

*Ying Fong v. Ashcroft,*
  317 F. Supp. 2d 398 (S.D.N.Y. 2004) .......................................................................15

**STATUTES**

8 U.S.C. § 1182(a)(6)(A)(i) ...........................................................................................6

8 U.S.C. § 1225(a) .......................................................................................................5

8 U.S.C. § 1225(b) ....................................................................................................5, 13

8 U.S.C. § 1229a ........................................................................................................13

8 U.S.C. § 1252 ..........................................................................................................19

8 U.S.C. § 1252(e) ..........................................................................................13, 14, 20, 23

8 U.S.C. § 1252(e)(1) ...................................................................................................5

8 U.S.C. § 1252(e)(2) ...........................................................................................1, 5, 23

8 U.S.C. § 1252(e)(2)(C) ..........................................................................................8, 20

8 U.S.C. § 1252(e)(5) ........................................................................................6

8 U.S.C. § 1252(f)(2) .................................................................................8, 19

8 U.S.C. § 1252(g) ...................................................................................12, 15

8 U.S.C. § 1255 ................................................................................................7

8 U.S.C. § 1324a(h)(3) ..................................................................................20

8 U.S.C. § 1182(a)(6)(A)(i) .............................................................................6

## FEDERAL REGISTER

69 Fed. Reg. 48877-01 (Aug. 11, 2004) ..........................................................6

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 602 ...........................................................................................21

Fed. R. Evid. 803(2) .......................................................................................21

## REGULATIONS

8 C.F.R. § 1235.3(b)(2)(i) .................................................................................5

8 C.F.R. § 274a.12 .........................................................................................21

8 C.F.R. § 274a.13 .........................................................................................21

In this action, Plaintiff Montes Bojorquez seeks to challenge an order of expedited removal that was entered against him following his apprehension by Customs and Border Protection ("CBP") on February 19 when he attempted to enter the United States from Mexico. *See* Dkt. 11 at ¶¶ 1, 10, 12, 98. He argues that this order of expedited removal is invalid because he was in Mexico due to the fact that he was expelled from this country the night before (the evening of February 18-19)[1] by CBP. *See id.* The Government denies that this alleged February 18-19 event occurred and, thus, this Court lacks jurisdiction over Mr. Montes' claims. *See* Dkt. 30 at 15.

In his Motion for Preliminary Injunction, he seeks a court order requiring his return to the United States, reinstating his deferred action and work authorization, and enjoining immigration authorities from detaining him. *See* Dkt. 29 at 3. The Government opposes this motion for several reasons.

First, the motion requests the ultimate relief that Mr. Montes seeks in his lawsuit. If this Court grants the motion, there does not appear to be any remaining live case or controversy with respect to his claims (other than with respect to his unrelated Freedom of Information Act ("FOIA") claims).

Second, this Court lacks jurisdiction over his claims under 8 U.S.C. § 1252(e)(2). Under this provision, orders of expedited removal are subject to very limited judicial review and this case must be dismissed unless he can establish that the February 18-19 event occurred. Taking into account his own allegations and exhibits, as well as CBP's attached declaration, he cannot show that the alleged expulsion on February 18-19 occurred.

Third, he cannot meet his burden under the four-part test for preliminary injunction. He cannot establish a substantial likelihood of success on the merits (because he cannot show that the February 18-19 event occurred). He cannot establish

---

[1] For the sake of clarity, the phrase "February 18-19" refers to the evening beginning on February 18 and continuing past midnight into the subsequent morning, February 19. The Government is not referring to the following evening (February 19), when Mr. Montes was apprehended attempting to enter the country.

a future immediate irreparable harm (especially because he has failed to offer any explanation for why he has waited since February to file his motion).  Finally, the balance of hardships and public interest do not tip in his favor given the Government's sovereign interest in controlling the border and enforcing U.S. immigration laws.

It is true that Mr. Montes requested and was granted deferred action through the Deferred Action for Childhood Arrivals ("DACA") policy by U.S. Citizenship and Immigration Services ("USCIS"), a sub-agency of the Department of Homeland Security ("DHS").  But this fact has very little to do with Mr. Montes' allegations in this action.  It is undisputed that if Mr. Montes freely travelled to Mexico without permission (as the Government contends), his DACA ended on that date.  Moreover, even individuals without DACA cannot be involuntarily expelled in the middle of the night without process or lawful authority.

### THE ALLEGATIONS OF MR. MONTES

Mr. Montes alleges that he was involuntarily expelled from the country the evening of February 18-19 by CBP.  Specifically, he alleges that on the evening of February 18, he went to Calexico, a border town on the U.S. side of the border, to have dinner with his friend, Danielle Jimenez and others.  Dkt. 29-1 at ¶ 11 *citing inter alia* Dkt. 29-2, Montes Decl. at ¶ 12.  He has stated that he also hoped to potentially see a woman named Leslie Ramirez in Calexico (she was to pick up her daughter in Mexicali that weekend).  Dkt. 29-1 at 12 citing Montes Decl. at ¶ 14.  He stated that he and Ms. Ramirez had discussed meeting that night at the Jack-in-the-Box near the Port of Entry in Calexico.  *Id.* [2]  He further stated that he left Ms. Jimenez's home around 10:00 p.m. and headed towards a taxi stand near the Jack-in-the Box restaurant to find a ride back home or possibly to meet up with Ms. Ramirez. *Id.*  He stated that when he left Ms. Jimenez's house he had "not yet heard from" Ms. Ramirez "about whether they were going to meet."  *See* Dkt. 29-1 at 12 citing Montes

---

[2]  She stated affirmatively that they had made plans to meet in Calexico the evening of February 18.  *See* Dkt. 29-5 at ¶ 10.

1  Decl. at ¶ 20.  Ms. Ramirez described things slightly differently, stating that Mr.

2  Montes had called several times, but she had decided to spend the evening with

3  friends in Mexicali rather than travel over the border to meet Mr. Montes and that she

4  "felt bad about canceling our plans."  *See* Dkt. 29-5 at ¶ 11 (suggesting that at some

5  point she told Mr. Montes that she was not going to meet him in Calexico).

6     He alleges that while walking in the area, he was stopped by a lone CBP officer

7  on a bicycle.  *See* Dkt. 29-1 at 12.  He was detained and subsequently forced into a

8  Government vehicle.  *Id.*  He further alleges that one of the agents told him that they

9  needed to check who he was and drove him to a nearby facility.  *Id.*  "Despite stating

10  that they needed to identify Mr. Montes, none of the agents appear to have checked

11  his fingerprints or immigration files."  *Id.* citing Montes Decl. at ¶ 26.  Mr. Montes

12  alleges that at approximately 1:00 a.m. or later on February 19, CBP expelled him

13  from the country to Mexicali along with other unidentified individuals. Montes Decl.

14  at ¶ 27.

15     After allegedly being expelled to Mexicali, where Ms. Ramirez was spending

16  the evening, he called her.  *See* Dkt. 29-1 at 14.  They met and he told her that he had

17  been expelled from the country.  *See id.*  He stated that he did not contact his mother

18  because "it was so late and I didn't know what to say."  Dkt. 29-2 at ¶ 31.

19     Around 2:11 a.m., Mr. Montes sent a Facebook message to his friend, Jose

20  Zarates, stating, "Dude come to Mexicali [expletive] hahah."  Dkt. 29-1 at 16.  There

21  are no other messages or phone calls listed that night.  *Id.*  It is not until the morning

22  of February 19 that Mr. Montes sent additional messages stating that he is in Mexicali

23  and to "[c]all me I need a favor" followed by several phone calls.  *Id.*

24     The following morning he met with Mr. Zarates and called his mother to tell her

25  what had allegedly happened to him.  *Id.*  He further alleges that, on February 19, he

26  was robbed in Mexicali.  *See* Dkt. 29-1 at 16.

27     On February 19, sometime after 7:00 p.m., Mr. Montes attempted to re-enter the

28  United States by jumping the fence at the international boundary.  *See* Dkt. 29-1 at 16.

1   He has explained this decision as an impulsive act.  *See* Dkt. 29-6 at ¶ 18 ("He said it

2   all happened so fast and that he was so nervous he didn't know what exactly happened

3   to him next, but in that moment, he ran and jumped the border fence out of

4   desperation . . .").  Contemporaneous Facebook messages suggest that Mr. Montes

5   planned on attempting to re-enter the country illegally and coordinated with Jose

6   Zarates.  *See* Dkt. 29-7 at 18.  Specifically, there were a series of calls and missed

7   calls starting at 6:33 p.m.  *See id.*  At some point after 6:42 p.m., Mr. Montes

8   messages "I'm in" and Mr. Zarates responds with a series of messages, "Where . . .

9   What about your clothes . . .  Do you want me to pick it up . . . ??"  *Id.* at 18-19.

10          Mr. Montes did not respond because, presumably, shortly after jumping the

11   fence,[3] he was apprehended by CBP.  *See* 29-7 at 18.  He was fingerprinted and

12   questioned by CBP.  *Id.*  He does not allege that he told CBP about the purported

13   expulsion of the previous evening.  *See* Dkt. 29-1 at 17.  In the afternoon of February

14   20, he was issued an Order of Expedited Removal and removed to Mexico.  *Id.* at 17;

15   Dkt. 29-2 at ¶ 52; Dkt. 29-14, Ex. 15 ("Notice and Order of Expedited Removal").  By

16   letter dated April 21, 2017, USCIS advised Mr. Montes that his deferred action and

17   employment authorization "terminated automatically as of the date of your departure

18   from the United States."  *See* Dkt. 29-14, Ex. 18 at 62.

19              **BACKGROUND ON EXPEDITED REMOVAL AND DACA**

20          Under the Immigration and Nationality Act ("Act"), Congress established a

21   system for admission and removal of arriving aliens that differs from the procedures

22   to which aliens who have been lawfully admitted are entitled.  Section 1225 generally

23   provides that aliens who arrive at the Nation's borders or who are found within its

24

25   [3]  In his declaration, he stated that he hid for about half an hour after crossing the
     border, but when he saw CBP agents he got scared and "turned myself in." Dkt. 29-2
26   at 48.  According to the record of his interview, when he was asked by CBP how long
     he was in the country before he was apprehended, he answered, "Not even two
27   minutes." Dkt. 29-15, Ex. 15 at 49-51 ("Record of Sworn Statement in Proceedings
     under Section 235(b)(1) of the Act").  When asked how far he was from the
28   international boundary when apprehended, he replied, "I was a block away." *Id.*
     When asked if there was anything else he would like to add, he replied, "No." *Id.*

borders without having been lawfully admitted are deemed "applicants for admission" who must be inspected by an immigration official before being granted admission. 8 U.S.C. § 1225(a). The expedited removal statute, 8 U.S.C. § 1225(b), provides that when an alien seeks admission to the United States and does not have entry documents, misrepresents their identity or citizenship, or presents fraudulent identity or immigration documents, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." § 1225(b)(1)(A)(i); *see also* 8 C.F.R. § 1235.3(b)(2)(i) (setting forth the regulations governing expedited removal); *Castro v. U.S. Dep't of Homeland Sec.*, 163 F. Supp. 3d 157, 160-61 (E.D. Pa. 2016) *aff'd* 835 F.3d 422 (3d Cir. 2016) (discussing the history of expedited removal).

Congress severely limited judicial review of orders of expedited removal. *See* 8 U.S.C. § 1252(e)(1) ("Without regard to the nature of the action or claim . . . no court may . . . enter declaratory, injunctive, or other equitable relief in any action pertaining to an order [of expedited removal] . . . except as specifically authorized in a subsequent paragraph of this subsection"). The subsequent paragraph limits judicial review to three questions:

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under [1225(b)], and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, [or is a refugee or has been granted non-terminated asylum].

8 U.S.C. § 1252(e)(2); *see Garcia de Rincon v. DHS*, 539 F.3d 1133, 1138-39 (9th Cir. 2008) (discussing this limitation on judicial review); *Galindo-Romero v. Holder*, 621 F.3d 924, 928 n.4 (9th Cir. 2010) *opinion amended and superseded on denial of reh'g* 640 F.3d 873 (9th Cir. 2011) (explaining that judicial review of orders of expedited removal is "strictly limited to three discrete inquiries set forth in § 1252(e)").

"In determining whether an alien has been ordered removed under 1225(b) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.  There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal."  8 U.S.C. § 1252(e)(5); *see Li v. Eddy*, 259 F.3d 1132, 1134-35 (9th Cir. 2001) *vacated on reh'g as moot* 324 F.3d 1109, 1110 (9th Cir. 2003) (discussing this provision and holding that it should be applied as it is written); *see Castro*, 163 F. Supp. 3d at 166 ("Congress could not have been clearer").[4]  Congress further provided that, notwithstanding any other provision of law, "no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by *clear and convincing evidence* that the entry or execution of such order is prohibited as a matter of law."  8 U.S.C. § 1252(f)(2) (emphasis added).  In 2004, the Department of Homeland Security specified that its use of expedited removal procedures would be limited to those aliens:  (1) apprehended within one hundred miles of the border, and (2) could not show that they have been present in the United States continuously for the fourteen days immediately before their seizure.  *Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48877-01 (Aug. 11, 2004).

More generally, individuals are removable if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012); *see* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled . . . is inadmissible."); § 1227(a)(1)(B) ("Any alien who is present in the United States in violation of this chapter or any other law of the United States . . . is deportable").  Removal is a civil, not criminal, matter.  *Arizona*, 132 S. Ct. at 2499.

---

[4] Administrative review of orders of expedited removal is also quite limited.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).

1   The Government cannot practicably remove every removable alien.  Rather,

2   "[a] principal feature of the removal system is the broad discretion exercised by

3   immigration officials."  *Arizona*, 132 S. Ct. at 2499.  The Government, "as an initial

4   matter, must decide whether it makes sense to pursue removal at all."  *Id*.  "At each

5   stage the Executive has discretion to abandon the endeavor." *Reno v. Am.-Arab Anti-*

6   *Discrimination Comm.*, 525 U.S. 471, 483 (1999) ("*AADC*").

7   Deferred action one way that the Government exercises prosecutorial

8   discretion.  Deferred action is "a regular practice" in which the Government exercises

9   its prosecutorial discretion "for humanitarian reasons or simply for [its] own

10  convenience," to notify an alien of a non-binding decision to forbear from seeking his

11  removal for a designated period.  *See AADC*, 525 U.S. at 483-84; 8 C.F.R. §

12  274a.12(c)(14) ("an act of administrative convenience to the government which gives

13  some cases lower priority").  Through "[t]his commendable exercise in administrative

14  discretion, developed without express statutory authorization," *AADC*, 525 U.S. at 484

15  (citations omitted), a removable individual may remain present in the United States so

16  long as the Government continues to forebear.

17  Deferred action does not confer lawful immigration status.  *See Ariz. Dream Act*

18  *Coal. v. Brewer*, 757 F.3d 1053, 1058-59 (9th Cir. 2014) *stay denied* 757 F.3d 1053

19  (2014).  An individual with deferred action remains removable at any time, and the

20  Government has the prosecutorial discretion to terminate deferred action unilaterally.

21  *See AADC*, 525 U.S. at 484-85; *see also*, *Texas v. United States*, 809 F.3d 134, 199

22  (5th Cir. 2015) (King, J., dissenting) (explaining that the terms "lawful presence" and

23  "deferred action" mean "nothing more than DHS's tentative decision, revocable at any

24  time, not to remove an individual for the time being – i.e., the decision to exercise

25  prosecutorial discretion").[5]

26  ---

27  [5]  Although Mr. Montes requests that he be granted "DACA status," as a technical
    matter, "DACA status" does not exist.  Rather in the immigration context, "status" is a
    term of art defined by the requirements set forth in 8 U.S.C. § 1255.  For the reasons

28  set forth above, if an individual is a recipient of DACA, the individual necessarily
    lacks lawful status under 8 U.S.C. § 1255.

1    On June 15, 2012, DHS issued a memorandum entitled, "Exercising

2 Prosecutorial Discretion with Respect to Individuals Who Came to the United States

3 as Children" ("2012 DACA Memo").  *See Ariz. Dream*, 757 F.3d at 1058-59.[6]  That

4 memorandum outlines a policy known as DACA that is available to a certain subset of

5 individuals who are unlawfully present in this country.  *See generally, id.* (describing

6 this program).  The memorandum expressly states, "[t]his memorandum confers no

7 substantive right, immigration status or pathway to citizenship.  Only the Congress,

8 acting through its legislative authority, can confer these rights."  The June 15, 2012,

9 Memorandum remains in effect today.  It is undisputed that if a DACA recipient

10 leaves the United States without permission from the U.S. Government, the recipient

11 loses DACA.  *See* Dkt. 29-1 at 11.

12    The Ninth Circuit recognizes that DACA determinations are not subject to

13 judicial review.  *See, e.g., Vilchiz-Soto v. Holder*, 688 F.3d 642, 644 (9th Cir. 2012);

14 *Rodriguez v. Sessions*, No. 15-72487, 2017 WL 695192, at *1 (9th Cir. Feb. 22,

15 2017); *Fabian-Lopez v. Holder*, No. 11-71513, 540 F. App'x 760, 761 n.2 (9th Cir.

16 April 29, 2013); *see also, Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir.

17 1987) (explaining that "denials of deferred action . . . are not subject to judicial

18 review"); *Luciano v. Holder*, No. 15-cv-0090-GPC(WVG), 2015 WL 4249520, at *3

19 (S.D. Cal. July 13, 2015) (summarizing Ninth Circuit law and stating that "the Court

20 lacks jurisdiction to consider whether Petitioner is eligible for any Deferred Action . . .

21 [or] to review denials of a [request for] deferred action . . .").

22                    **STANDARD FOR A PRELIMINARY INJUNCTION**

23    "The purpose of a preliminary injunction is merely to preserve the relative

24 positions of the parties until a trial on the merits can be held."  *University of Texas v.*

25

26 _____

27 [6]  U.S. Citizenship and Immigration Services' description of this program, guidance
   for applying, and related documents can be found at
28 https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-
   daca (last visited July 31, 2017).

1    *Camenisch*, 451 U.S. 390, 395 (1981).  As a result, it is generally inappropriate at the

2    "preliminary-injunction stage to give a final judgment on the merits."  *Id.*; *see Senate*

3    *of State of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) (holding that

4    "judgment on the merits in the guise of preliminary relief is a highly inappropriate

5    result"); *see, e.g., Taiebat v. Scialabba*, Case No. 17-cv-0805-PJH, 2017 WL 747460

6    (N.D. Cal. Feb. 27, 2017) (declining to order an agency to adjudicate an immigrant's

7    petition because this "is the exact same ultimate relief that he seeks" in his lawsuit);

8    *White v. Smyers*, No. 212-cv-2868-MCE(ACP), 2016 WL 4445338, at *6 (E.D. Cal.

9    Aug. 23, 2016), *report and recommendation adopted,* No. 212-cv-2868-MCE(ACP),

10   2016 WL 5661773 (E.D. Cal. Sept. 30, 2016) ("The fact that plaintiff's pending

11   motion for injunctive relief reflects the ultimate issues in this case renders preliminary

12   injunctive relief inappropriate.").

13           "A preliminary injunction is an extraordinary remedy never awarded as of

14   right."  *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 24 (2008).  "A plaintiff

15   seeking a preliminary injunction must establish that he is likely to succeed on the

16   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

17   that the balance of equities tips in his favor, and that an injunction is in the public

18   interest."  *Winter*, 555 U.S. at 20 (reversing and rejecting prior Ninth Circuit law that

19   had allowed the issuance of a preliminary injunction based on the possibility of

20   irreparable harm); *see Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132

21   (9th Cir. 2011) (explaining that post-*Winter*, "plaintiffs must establish that irreparable

22   harm is *likely,* not just possible, in order to obtain a preliminary injunction")

23   (emphasis original).

24           In addition, the Ninth Circuit also recognizes an "alternative test" for a

25   preliminary injunction, explaining that when the balance of hardships tips "decidedly"

26   toward the plaintiff, the district court need not require a robust showing of likelihood

27   of success on the merits and may grant preliminary injunctive relief if the plaintiff

28   raises "serious questions" on the merits.  *Caribbean Marine Services Co., Inc. v.*

1   *Baldrige*, 844 F.2d 668, 974 (9th Cir. 1988); *see Alliance,* 632 F.3d at 1135

2   (explaining that "serious questions going to the merits" and a balance of hardships that

3   tips "sharply" towards the plaintiff can support issuance of a preliminary injunction,

4   so long as the plaintiff also shows that there is a likelihood of irreparable injury and

5   that the injunction is in the public interest).  On at least one occasion, the Ninth

6   Circuit has declined to apply the "alternative test" in the context of a motion for

7   preliminary injunction seeking the "whole case for all practical purposes."  *Senate of*

8   *State*, 968 F.2d at 978 (reversing).

9       In addition, a motion for preliminary injunction that seeks mandatory relief "is

10  subject to heightened scrutiny and should not be issued unless the facts and law

11  clearly favor the moving party."  *Dahl v. HEM Pharmaceuticals Corp*., 7 F.3d 1399,

12  1403 (9th Cir. 1993); *see Anderson v. United States*, 612 F.2d 1112, 1114 (1979)

13  ("Mandatory preliminary relief, which goes well beyond simply maintaining the status

14  quo Pendente lite, is particularly disfavored, and should not be issued unless the facts

15  and law clearly favor the moving party").

**ARGUMENTS**

16

17  **I.    It is inappropriate to grant Mr. Montes the ultimate relief that he seeks at**

18  **the preliminary injunction stage**.

19      A plaintiff is not entitled to a final judgment on the merits at the preliminary

20  injunction stage of litigation.  *See University of Texas*, 451 U.S. at 395; *Senate of the*

21  *State*, 968 F.2d at 978.  Here, Mr. Montes is challenging an order of expedited

22  removal that was entered against him and bars his reentry into the United States for a

23  period of time.  Although his motion is styled as a motion for preliminary injunction,

24  he seeks a court order requiring his return to the United States, reinstating his DACA

25  and work authorization, and barring immigration authorities from detaining him.  *See*

26  Dkt. 29 at 3.  If the Court were to grant this relief, it does not appear that there would

27  be any remaining live case or controversy with respect to these claims.  Thus, Mr.

28

1   Montes would, in effect, receive a final judgment in his favor under the "guise" of a

2   motion for preliminary injunction. *See Senate of the State,* 968 F.2d at 978.[7]

3       This outcome would be particularly troubling here, because Mr. Montes seeks a

4   preliminary injunction under the "alternative test."   He is arguing that there are

5   "serious questions" and the balance of hardships tips decidedly in his favor and, thus,

6   he should not be required to demonstrate a substantial likelihood of success on the

7   merits. *See id.* To grant Mr. Montes this relief under these circumstances would turn

8   the plaintiff's burden of proof on its head; Mr. Montes would, effectively, obtain a

9   final judgment without even being required to show a substantial likelihood of success

10   on the merits. *See id.* Under these circumstances, this Court should not grant the

11   "extraordinary remedy" of a preliminary injunction. *See Winter*, 555 U.S. at 24.

12       Additionally, the Government notes the remarkable nature of the relief sought

13   by Mr. Montes.  The Supreme Court has long recognized that "the power to expel or

14   exclude aliens as a fundamental sovereign attribute exercised by the Government's

15   political departments largely immune from judicial control." *See Fiallo v. Bell*, 430

16   U.S. 787, 792 (1977); *see also, Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89

17   (1952) (explaining that control of the Nation's borders is "interwoven" with "the

18   conduct of foreign relations" and "the war power"); *see generally*, *United States v.*

19   *Flores-Montano*, 541 U.S. 149, 152-53 (2004) (The political branches' broad power

20   over immigration is "at its zenith at the international border").

21       Viewed against this constitutional backdrop, it is not correct to suggest, as Mr.

22   Montes does, that federal courts often require the Government to admit a foreign

23

---

24   [7]  In *Senate of the State*, the controversy at issue was whether certain data should be
released.  *See* 968 F.2d at 978.  Once released, there was essentially nothing further

25   for the Court to decide.  *See id*. Here, the controversy at issue is whether Mr. Montes
should be admitted into this country notwithstanding an order of expedited removal

26   barring his re-entry.  If he is ordered back into the country, there is essentially nothing
further to decide.  Of course, the Government could subsequently place Mr. Montes

27   in regular removal proceedings before an immigration judge (so-called 240
proceedings), *see* U.S.C. § 1229a (found at INA § 240), but these proceedings are

28   quite different from the expedited removal proceedings authorized by Congress, 8
U.S.C. § 1225(b).

national into the United States on an emergency basis.  *See* Dkt. 29-1 at 31.  Rather a more accurate statement would be that in the context of a petition for review, circuit courts have ordered individuals admitted *after the circuit court has ruled on the merits of the petition for review* and ruled in favor of the alien.  *See, e.g, Orabi v. Attorney General of United States*, 738 F.3d 535, 543 (3d Cir. 2014) (case cited by Mr. Montes).  This makes sense because if the only basis for removing an individual is an order of removal that was improperly entered, then there is no legal basis for excluding the individual from the country.  But this is a far cry from ordering that an individual be admitted to the United States on an emergency basis when there has not been a determination of the merits of his claim

It is also true that there are district court cases, decided under prior law,[8] ordering that an individual be returned to the United States when the individual was removed either in violation of a district court's stay of removal, *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 408 (S.D.N.Y. 2004) (case cited by Mr. Montes), or when the Government interfered with a district court's ability to rule on a pending motion.  *See, e.g., Dennis v. I.N.S.*, No. 301-CV-279-SRU, 2002 WL 295100 (D. Conn. Feb. 19, 2002) (district court failed to timely rule on pending motion because it relied on an incorrect representation from the Government) (case cited by Mr. Montes); *Rantesalu v. Cangemi*, No. 04-CV-1375 (JRT/SRN), 2004 WL 898584, at *7 (D. Minn. Apr. 23, 2004) (alien had sought on an expedited ruling on request for stay when the Government removed the alien) (case cited by Mr. Montes).  But these cases implicate the power and authority of courts to enforce and effectuate their own orders. *See Ying*

---

[8]  Under current law, 8 U.S.C. § 1252(g) precludes a district court from staying the execution of an order of removal.  *See* 8 U.S.C. § 1252(g) (barring review of the decision or action to "commence proceedings, adjudicate cases, or execute removal orders against any alien under this subchapter"); *see generally*, *Luciano*, 2015 WL 4249520, at **2-3 (holding that under 8 U.S.C. § 1252(g) district courts lack jurisdiction to stay removal proceedings); *J.E.F.M. v. Lynch*, 837 F.3d 1029, 2031 (9th Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR [petition for review] process") (emphasis original).

1   *Fong*, 317 F. Supp. 2d at 44.  They are distinguishable from the present case in which

2   the Government neither violated a court order nor interfered with the ability of a

3   district court to grant relief.  *See id*.[9]

4         Lastly, this Court should exercise particular scrutiny with respect to Mr.

5   Montes' claims because, if this Court grants his motion, Mr. Montes would not simply

6   return him to the same position he was in before the order of expedited removal was

7   entered against him (when he was in Mexico).  *See Dahl*, 7 F.3d at 1403.  Rather he

8   would be placed in a superior position because he would be returned to the United

9   States and granted DACA and employment authorization (which he did not have prior

10   to the entry of the order of expedited removal).  In fact, he would be placed in a

11   position superior to all other DACA recipients because the Government would be

12   barred from detaining him in the event that it ever determines to commence removal

13   proceedings against him.  Given that Mr. Montes does not simply seek to preserve the

14   status quo, his request should be "subject to heightened scrutiny."  *See Dahl*, 7 F.3d at

15   1403.

16   **II.**   **Mr. Montes cannot demonstrate that this Court has jurisdiction over his**

17        **claims.**

18         As a general rule, orders of expedited removal are not subject to judicial review

19   except under very limited circumstances.  *See* 8 U.S.C. § 1252(e) (barring any court

20   from entering injunctive or other equitable relief, except after first finding that the

21   petitioner is (a) a U.S. citizen, (b) was not ordered removed under an order of

22   expedited removal, or (c) has lawful permanent resident status or is a refugee or

23

---

24   [9]  The only other example cited by Mr. Montes is *Vayeghan v. Kelly* in which it

25   appears that an individual was placed on a flight to Dubai before the Court could rule
   on a TRO.  Case No. 2:17-702, ECF 5 (C.D. Cal. Jan 29, 2017) cited Dkt. 29-1 at 31.

26   This case is different from the other cases cited in that there does not appear to have
   been an order of removal but rather the individual's visa was cancelled in flight.  *See*

27   *id*.  This single unpublished case is simply insufficient to support a contention that
   "numerous" courts have directed Government officials to return individuals who were

28   wrongfully deported, especially because it appears that the plaintiff in that case was
   never admitted and, thus, necessarily could not be "deported."  *See* Dkt. 29-1 at 31.

asylee); *Garcia*, 539 F.3d at 1138-39 (applying this limitation).  Because Mr. Montes is not claiming to be a U.S. citizen, lawful permanent resident, refugee, or asylee, and does not dispute that an order of expedited removal has been entered against him, normally this Court would lack jurisdiction over his claims.  *See* 8 U.S.C. § 1252(e). As a result, Defendants have answered the First Amended Complaint raising lack of jurisdiction as a defense and seeking "limited jurisdictional discovery as to whether the purported 'February 18-19, 2017' event occurred."  *See* Dkt. 30 at 15.

In sum, the power of this Court to grant him any relief with respect to his claims, including specifically his request for an order compelling his entry into this country, turns entirely on his ability to prove his allegation regarding the evening of February 18-19.  Given that there is a presumption of regularity that attaches to the actions of Government agencies, *see, e.g., U.S. Postal Service v. Gregory*, 534 U.S. 1, 10 (2001); *Red Top Mercury Mines, Inc. v. United States*, 887 F.2d 198, 202-203 (9th Cir. 1989), Mr. Montes cannot overcome this presumption in light of the evidence that he submitted and the Government's sworn declaration refuting his claims.   *See generally, Diaz-Sanchez v. Gonzales*, No. 04-70253, 128 Fed. Appx. 1, *2 (9th Cir. Feb. 11, 2005) ("Petitioner failed to overcome this presumption with his self-serving affidavit . . .") (unpublished).  For this reason, the Court should deny Mr. Montes' Motion for Preliminary Injunction.

## 1.   Mr. Montes cannot establish jurisdiction in light of the inconsistencies within his Motion for Preliminary  Injunction.

Mr. Montes' Motion for Preliminary Injunction and supporting documents contain a number of inconsistencies.  First, his account of the alleged February 18-19 event is in tension with his Facebook messages.  He alleges that he was apprehended and expelled from this country at some point after 10:00 p.m. on the evening of February 18.  His message to his friend Jose Zarate on February 19 at 2:11 a.m. simply states, "Dude come to Mexicali [expletive] hahah."  Dkt. 29-1 at 16.  Not only does he not mention the alleged expulsion, the tone of this message, including the

word "hahah" at the end, seems inconsistent with an individual who was just unexpectedly expelled from the country in the middle of the night.[10]   There are no other messages or phone calls listed that night.  *Id.*  It is not until the morning of February 19 that Mr. Montes sent additional messages stating that he was in Mexicali and to "[c]all me I need a favor" followed by several phone calls.  *Id.*  Although not unequivocal, these messages are more consistent with someone who freely traveled to Mexicali than someone who was unexpectedly grabbed off the street at night and expelled from the country by CBP (as he alleges).

Second, rather than try to resolve his alleged expulsion through legal means, Mr. Montes, instead, jumped the fence and tried to sneak back into the country at some point on February 19 around 7:00 p.m.  He has explained this decision as an impulsive act.  *See* Dkt. 29-6 at ¶ 18 ("He said . . . he didn't know what exactly happened to him next . . . he ran and jumped the border fence. . . ").  However, although not conclusive, contemporaneous Facebook messages suggest that Mr. Montes planned on attempting to re-enter the country illegally and coordinated with Jose Zarates.  *See* Dkt. 29-7 at 18.  Specifically, there were a series of calls and missed calls starting at 6:33 p.m.  *See id.*  At some point after 6:42 p.m., Mr. Montes messages "I'm in" and Mr. Zarate responds with a series of messages, "Where . . . What about your clothes . . . Do you want me to pick it up . . . ??"  *Id.* at 18-19.  Mr. Montes does not respond, presumably because he had been apprehended by CBP.  *See id.*

Third, following his apprehension on the evening of February 19, Mr. Montes was interviewed by CBP.  In this interview, he made no mention of the alleged February 18-19 event, even when asked, "Is there anything else you would like to

---

[10]  Moreover, the expletive that was deleted was the word "puto" a vulgar slur suggesting a teasing exchange rather than exasperation or concern.  Although Mr. Zarates characterizes this February 19 message as "saying that he [Mr. Montes] was in Mexicali and that he needed help," Dkt. 29-6 at ¶ 5, it is unclear how Mr. Zarates came to this conclusion given the language and tone of the message.

add?"  *See* Dkt. 29-14 at 49-51 (Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act).

Fourth, Mr. Montes alleges that back on the evening of February 18, CBP apprehended him, took him to a station to be identified, and then failed to take any steps to identify him (such as taking his fingerprints).  *See* Dkt. 29-1 at 13 ("Despite stating that they needed to identify Mr. Montes, none of the agents appear to have checked his fingerprints or immigration files").  However, the presumption of regularity generally applies to the performance by government officials of their duties. *See Red Top*, 887 F.2d at 202-3; *see also*, *Diaz-Sanchez*, 128 Fed. Appx. at *2 (unpublished) (applying this presumption in the context of immigration law); *Riad v. I.N.S.*, 161 F.3d 14 (9th Cir. 1998) (unpublished) (same).  Here, Mr. Montes failed to overcome this presumption with his unsupported allegations.  Moreover, it is difficult to understand why an agent would act in the manner that Mr. Montes alleges.

Fifth, the allegations regarding Leslie Ramirez are notable.  *See* Dkt. 29-1 at 11. Mr. Montes stated he hoped to see her in Calexico the night of February 18.  *See id*. citing Montes Decl., ¶14 (she stated affirmatively that they had made plans to meet in Calexico the evening of February 18; 29-5 at ¶ 10).  He stated that when he left his friend's house around 10:00 p.m. (February 18) he had "not yet heard from" Ms. Ramirez.  *See* Dkt. 29-1 at 12-13.  She described the evening slightly differently stating that Mr. Montes had called several times, but she had decided to spend the evening with friends in Mexicali rather than travel over the border to meet Mr. Montes and that she "felt bad about canceling our plans."  *See* Dkt. 29-5 at ¶ 11 (suggesting that at some point she told Mr. Montes that she was not going to meet him in Calexico).  At the same time (after 10:00 p.m., February 18), Mr. Montes was allegedly apprehended by CBP and expelled to Mexicali, where Ms. Ramirez was with her friends.  *See* Dkt. 29-1 at 12-13.  Mr. Montes then called Ms. Ramirez and met her, allegedly telling her that he had just been deported.  *See* Dkt. 29-1 at 14.  This coincidence is remarkable.

2. **Mr. Monte's account of the alleged February 18-19 event is contradicted by the Government's sworn declaration.**

Attached to this Opposition, is a declaration from the Chief Patrol Agent for El Centro Sector. El Centro Sector includes the Calexico Borders Patrol Station whose area of responsibility includes downtown Calexico. Declaration of Rodney Scott ("Scott Decl.") at ¶¶ 1, 3, 4. Chief Scott is responsible for managing all Border Patrol operations and administrative functions within El Centro Sector. *Id*. at ¶ 1. This declaration is significant for three reasons.

First, the declaration states that it is the practice of the Office of Border Patrol to not remove individuals under any of its enforcement options, including voluntary removal, without documenting the individual's removal. *Id*. at ¶ 5. Whenever the United States Border Patrol apprehends or removes an individual, it creates, in the ordinary course of business, certain documents reflecting these actions. *Id*. at ¶ 6. These documents are generated by, retained within, and searchable through the agency's computer systems. *Id*. The Office of Border Patrol, including El Centro Sector, has conducted multiples searches for any and all documents related to Mr. Montes. *Id*. at ¶ 7. As a result of these searches, the agency has discovered no documentation of Mr. Montes' alleged apprehension on February 18 or alleged removal on February 19. *Id*. CBP does have records, which it has provided, relating to Mr. Montes arrest the evening of February 19 which resulted in the entry of an order of removal and his removal on February 20. Thus, the absence of any documents reflecting the alleged February 18-19 expulsion, is strong evidence that it did not occur.

Second, Mr. Montes states that he was encountered the evening of February 18 by a lone CBP officer on a bicycle. Dkt. 29-1 at 12 citing Montes Decl., ¶ 23. But Border Patrol Agents, at least within El Centro Sector, are only assigned bicycle patrol duties in pairs. Scott Decl. at ¶ 9. Moreover, records indicate that all Border Patrol Agents within Calexico Border Patrol Station were assigned vehicles for patrol duties

1  on February 18, 2017.  *Id*. at ¶ 10.  The absence of bicycle patrols on February 18 is

2  another indicator that the alleged encounter did not occur.

3       Third, Mr. Montes alleges that, late at night (after 10:00 p.m. February 18-19), a

4  CBP or Border Patrol agent took Mr. Montes "and several other detainees"[11] to the

5  border near Mexicali and told them to "walk straight into Mexicali."  *See* Dkt. 29-1 at

6  13 citing Montes Decl. at ¶ 27.   He further stated that this happened at approximately

7  1:00 a.m. or later.  *See* Montes Decl. at ¶ 27.  But El Centro Sector has not repatriated

8  anyone to Mexico after 10:00 p.m. this calendar year (2017).  *See* Scott Decl. at ¶ 8.

9       **3.**    **The additional declarations from other "witnesses" that Mr. Montes**

10            **provided are neither admissible nor probative.**

11       Mr. Montes attached several declarations from "witnesses" to his Motion for

12  Preliminary Injunction.  As a general matter, a witness must have "personal

13  knowledge of the matter" to which he or she testifies.  *Bemis v. Edwards*, 45 F.3d

14  1369, 1373 (9th Cir. 1995) citing Fed. R. Evid. 602.  Here, none of the witnesses have

15  any knowledge of the alleged February 18-19 arrest and expulsion.  Rather, they are

16  relaying Mr. Montes' account of what happened.  This testimony is both hearsay[12]

17  and, more importantly, is of almost no probative value.

18       The two additional declarations that Mr. Montes submits are also very

19  problematic.  The first, is from Madelon V. Baranoski, Ph.D.  Dkt. 29-10.  She admits

---

[11]  As of this date, none of these unnamed detainees have come forward to corroborate Mr. Montes' account.

[12]   Mr. Montes suggests that this testimony may be admissible as an "excited utterance" but a narrative or accounting of what happened, is, almost by definition, not a sudden "excited utterance"  *See U.S. v. Alarcon-Simi*, 300 F.3d 1172, 1175 (9th Cir. 2002).  An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. 803(2).  The elements requires to establish an excited utterance include:  (1) an occurrence or event sufficiently startling to render normal reflective thought processes inoperative, (2) a statement that is a spontaneous reaction to the occurrence or event and not the result of reflective thought, which (3) relates to the occurrence or event.  *Alarcon-Simi*, 300 F.3d at 1175.   Thus, a detailed narrative of events is not admissible as an "excited utterances."  *See, e.g., Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1026-28 (N.D. Cal. 2006).

1  that she has not examined Mr. Montes and offers "no diagnosis."  Dkt. 29-10 at ¶ 5.

2  Nonetheless she offers an opinion as to what she "would expect" happened.  *See id*. at

3  ¶ 7.  Without some foundation for this opinion, it amounts to little more than

4  speculation by someone who was not there and is of no value to a factfinder.

5  　　　Mr. Montes also provides a declaration from R. Gil Kerlikowske, former

6  Commissioner of CBP.  Dkt. 29-12.  He has no personal knowledge of the allegations

7  in this case and instead also speculates as to what might have happened.  Specifically,

8  he states that he thinks CBP officers "would have been trained on how to identify a

9  DACA recipient in their custody."  *Id*. at ¶ 7.   But it is undisputed here, Dkt. 29-1 at

10  11, that if Mr. Montes freely travelled to Mexico without permission, he was no

11  longer a recipient of DACA.  Thus, this declaration is also of no value in determining

12  whether the Court has jurisdiction.

13  **III.　　Mr. Montes failed to meet his burden under *Winters*.**

14  　　　**1.　　Mr. Montes failed to show a substantial likelihood of success on the**

15  　　　　　　**merits**.

16  　　　For the reasons stated above, Mr. Montes cannot establish that the February 18-

17  19 event occurred and, thus, cannot demonstrate a substantial likelihood of success on

18  the merits.  In his Motion for Preliminary Injunction, he argues that he should be

19  excused from being required to establish substantial likelihood of success on the

20  merits given the balance of the hardships.  *See* Dkt. 29-1 at 20.  However, as

21  previously explained, this "alternative test" should not be applied when a plaintiff

22  seeks essentially all of the relief in the form of a preliminary injunction.  *See Senate of*

23  *the State*, 968 F.2d at 978.

24  　　　Moreover, his argument is in tension with the text of 8 U.S.C. § 1252 which

25  expressly provides that an alien seeking to enjoin his removal, pursuant to an order of

26  expedited removal, must show by "clear and convincing evidence that the entry or

27  execution of such order is prohibited as a matter of law."  *See* 8 U.S.C. § 1252(f)(2).

28  Mr. Montes is not trying to enjoin his removal (he has already been removed).   But it

1 does not make any sense to require an alien to show by "clear and convincing

2 evidence" that he should not be removed, but once removed, he would not be required

3 to make *any* showing before he is ordered returned.  Additionally, by statute, a *lawful*

4 permanent resident challenging his order of expedited removal must prove "by a

5 preponderance of the evidence" that he or she has status, and, then, the only relief

6 permitted is further inquiry before an immigration judge.  8 U.S.C. § 1252(e)(2)(C).

7 Mr. Montes is an alien who has never had lawful status.  It would make no sense to

8 make it easier for him to challenge his order of expedited removal and provide him

9 with additional remedies not available to lawful residents under 8 U.S.C. § 1252(e)

10 simply because he *lacks* lawful status.

11         There are additional reasons why Mr. Montes is not entitled to court-ordered

12 relief as to DACA or employment authorization.  The Ninth Circuit recognizes that it

13 lacks jurisdiction to consider eligibility for DACA.  *See Rodriguez*, 2017 WL 695192,

14 at *1; *see also*, *Mada-Luna*, 813 F.2d at 1011 n.4 (Courts lack jurisdiction to review

15 denials of deferred action); *Luciano*, 2015 WL 4249520, at *3 (same).  And, although

16 the Ninth Circuit has never directly addressed the question,[13] other courts have found

17 that the decision to grant or deny employment authorization is also not subject to

18 judicial review.  *See Perales v. Casillas*, 903 F.2d 1043, 1047-48 (5th Cir. 1990)

19 ("[T]here is nothing in the [INA] expressly providing for the grant of employment

20 authorization . . .  to aliens who are the beneficiaries of approved petitions") (vacating

21 the challenged portion of the injunction); *see, e.g., Ovalle v. U.S. Dep't of Homeland*

22 *Sec.*, No. 09-CV-3820 (SLT)(LB), 2010 WL 5158105, *3 (E.D.N.Y. Nov. 24, 2010)

23 ("Judicial review of the denial of an application for employment authorization is

24 precluded by 8 C.F.R. § 2741.13(c)"); *Kaddoura v. Gonzales*, No. C06-1402 RSL,

25

26 _____

[13]  The Ninth Circuit has, however, noted that Congress has given the Executive

27 "broad discretion to determine when noncitizens may work in the United States." *Ariz. Dream*, 757 F.3d at 1062 citing 8 U.S.C. §§ 1324a(h)(3); (h)(l); (b)(1)(C)(ii).

28 This recognition suggests that if the question were before the Ninth Circuit it might also find that the decision to grant or deny employment authorization is not subject to judicial review.

2007 WL 1521218, **4-5 (W.D. Wash. May 21, 2007) ("[U]nder the plain language 8 C.F.R. §§ 274a.12 and 274a.13, his eligibility for an EAD [Employment Authorization Document] resides within the discretion of USCIS and there is no appeal from the denial of the application.").  Thus, it would not be appropriate for this Court to provide Mr. Montes injunctive relief with respect to DACA or employment authorization in any event.

>    **2.    Plaintiff failed to establish a future immediate irreparable harm.**

Before being granted a preliminary injunction a plaintiff must show "that the harm is not only irreparable but must demonstrate immediate threatened injury." *Wahoo Intern., Inc. v. Phix Doctor, Inc*., No. 13-cv-1395-GPC(BLM), 2014 WL 2106482, at *3 (S.D. Cal. May 20, 2014) citing *Carribean*, 844 F.2d at 674.  "A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief."  *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984); *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc*., 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); *see, e.g., Roberts v. Veterans Village Enterprises, Inc*., Case No. 17-cv-524-LAB(MDD), 2017 WL 1063477, at *1 (S.D. Cal. Mar. 20, 2017) ("Delays in seeking relief are considered when determining whether preliminary injunctive relief should be granted"); *Wahoo Intern.,* 2014 WL 2106482, at *3 (*sua sponte* raising this issue and concluding that delay in seeking injunctive relief "demonstrates [a] lack of irreparable harm").

Here, Mr. Montes argues, at some length, that removal from the country constitutes irreparable harm.  *See* Dkt. 29-1 at 28-29.  But Mr. Montes is not seeking to enjoin his removal from this country; he is already in Mexico.  Rather he seeks certain affirmative relief from this Court.  *See* Dkt. 29 at 3-4.  He is not entitled to this relief because he has failed to make a showing that he will suffer a *future* immediate harm if he is not granted relief.  *See Carribean*, 844 F.2d at 674.  It is understandable why Mr. Montes, like any other plaintiff, would like to be granted relief now rather

than at a future point in time.  But that is not the standard for a preliminary injunction.  *See Winter*, 555 U.S. at 20.

Mr. Montes contends that he has suffered injuries as a result of alleged events that occurred in February.  *See* Dkt. 29-1 at 28.  Without more, he is not entitled to a preliminary injunction with regard to these alleged events.  Moreover, although not dispositive, Mr. Montes has failed to make any showing as to why he waited over five months to file this motion.  *See Wahoo Intern.*, 2014 WL 2106482, at *3.

Lastly, Mr. Montes alleges that he has been unable to secure a well-paying job in Mexico.  *See* Dkt. 29-1 at 29.  But his own Facebook posts suggest that he was not regularly employed at the time immediately before his alleged expulsion from the United States.[14]  For this additional reason, Mr. Montes has failed to meet his burden.

**3.    Plaintiff failed to establish that the balance of hardships tips decidedly in his favor.**

The final two elements of the preliminary injunction standard – the balance of the hardships and the public interest – will be considered together because these factors merge when the Government is a party to a lawsuit.  *See* Dkt. 29-1 at 29-30; *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).  Mr. Montes contends that the balance of hardships tips decidedly in his favor because the Government will not suffer "any" harm if he is granted a preliminary injunction.  *See* Dkt. 29-1 at 29-30.  He contends essentially that he is right, the Government is wrong, and, thus, the Government will not be harmed if it is enjoined because its actions were unlawful.  *Id*. at 30.  But this reasoning is circular.

Rather than assuming that Plaintiff's allegations regarding February 18-19 are true, this Court should examine the parties' respective equities and hardships to determine whether they tip decidedly in Mr. Montes' favor.  *See Nken*, 556 U.S. at

---

[14]  Specifically, his exchange with Jose Zarates the evening of February 17, 2017 beginning  at 5:31 p.m. suggests that he was not regularly employed in the United States, "Juan:  [Expletive] are you working tomorrow????; Jose:  Yes man; Juan:  Any work for me man; Juan:  ???; Juan:  It's okay if they pay later."  *See* Dkt. 29-7 at 16.

435-36 (2009) (explaining that, in the context of immigration, courts cannot simply "assume" that the balance of hardships weighs heavily in favor of the applicant). Courts have repeatedly recognized that the Government is harmed when it is enjoined from enforcing the law. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury") (citations and quotations omitted); *see also*, *Lydo*, 745 F.2d at 1213 (reversing, in part, on the grounds that an injunction harms a city because it prevents the enforcement of a city ordinance). This harm is even more pronounced in the context of immigration law, which implicates the Government's sovereign interest in exercising control of the border and excluding individuals who are not admissible under U.S. immigration law. *See Fiallo,* 430 U.S. at 792; *see also, Nken,* 418 U.S. at 435-36 ("There is always a public interest in prompt execution of removal orders"); *Castro*, 163 F. Supp. 3d at 174 ("Given that admission decisions are uniquely the Executive's, its interest here are considerable").

Moreover, both Congress and the Executive Branch have a strong interest in the congressionally-created expedited removal program. *See Castro*, 163 F. Supp. 3d at 174 (discussing the need for "expedition and finality"). Congress conferred on the Executive Branch the discretion to issue orders of expedited removal under certain circumstances and decided to make such orders largely immune from judicial review. *See* 8 U.S.C. § 1252(e)(2). The Government has a strong interest in the validity of an order of expedited removal and is harmed whenever it is set aside, especially because expedited removal is a vital tool for exercising control at U.S. borders and discouraging foreign nationals from improperly seeking entry. *See Castro*, 163 F. Supp. 3d at 174. The Government also has an interest in safeguarding DACA policies. It is undisputed that DACA recipients who travel to another country without permission lose DACA, *see* Dkt. 29-1 at 11, and the Government has an interest in ensuring that this policy is not disregarded. Lastly, the Government has an interest

that those individuals who are not permitted to legally work in the United States do not in fact work legally in this country. *See generally, Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014) (explaining that one of the purposes of the INA was to protect U.S. workers); *Intern. Union of Bricklayers and Allied Craftsmen v. Meese*, 761 F.2d 798, 805 (D.C. Cir. 1985) ("Congress has thus been concerned with the impact of competition by foreigners on the American labor force since 1885, and has passed increasingly restrictive legislation on the entry of nonimmigrant alien workers").

The Government recognizes that Mr. Montes is harmed by being unable to enter this country at this time.  However, he cannot meet his burden of proving that the balance of hardships tips *decidedly* in his favor given the competing compelling sovereign interests of the Government in this case.[15]  Moreover, in light of the evidence presented here, Mr. Montes' harm is entirely of his own making stemming from his decision to leave the United States without prior authorization.

## CONCLUSION

WHEREFORE, this Court should deny Mr. Montes' Motion for Preliminary Injunction and order limited jurisdictional discovery with respect to the alleged events of February 18-19, 2017.

---

[15]  In his Motion for Preliminary Injunction, Mr. Montes cites *Melendres v. Arpaio* to support his contention that the balance of hardships tips decidedly in his favor.  *See* Dkt. 29-1 at 31 citing 695 F.3d 990 (9th Cir. 2012).  But this case involved the unusual situation in which a governmental entity was enjoined from taking an action that it represented it was not going to take anyways.  *Melendres*, 695 F.3d at 1002 ("The Defendants cannot be harmed by an order enjoining an action they will not take").  Moreover, the Ninth Circuit made a specific finding that the injunction would not impair the governmental entity's ability to enforce local or even federal criminal law.  *Id.*  Lastly, *Melendres* did not involve a case in which a plaintiff was arguing that the balance of hardships tipped decidedly in his favor and, thus, he was not required to establish a substantial likelihood of success on the merits.  *See id.*  Therefore, *Melendres* is not applicable to the present case, except for the unremarkable proposition that the public has an interest in ensuring that the Constitution is followed.

Dated: August 8, 2017

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
District Court Section

JEFFREY S. ROBINS
Assistant Director
Office of Immigration Litigation
District Court Section

*/s/ Aaron S. Goldsmith*
AARON S. GOLDSMITH
Senior Litigation Counsel
Virginia State Bar No. 45405
Email: Aaron.Goldsmith@usdoj.gov
Telephone: (202) 532-4107
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

NICOLE GRANT
Trial Attorney

ALANA W. ROBINSON
Acting United States Attorney

REBECCA G. CHURCH
Assistant U.S. Attorney

Attorneys for Defendants